Very good. The next case on our calendar is Trainum v. Collins. Good morning. Good morning. Thank you, Your Honor. You may please the Court. Gregory Duboff, on behalf of Scott and Brian Trainum, this appeal arises from Rockwell Collins' acquisition of International Communications Group. After a 15-day bench trial, the District Court got nearly everything right. Our issue on appeal is a narrow but significant one and involves one of the District Court's damages calculations, which was improper as a matter of law. The rule in New York is that proof of damages is an essential element of a claim for breach of contract, and such damages must be proved to a reasonable certainty by providing a stable evidentiary foundation for a reliable calculation of damages. With regard to the warranty against material adverse effects, Rockwell failed to meet this burden, and that is because it provided no evidence of its damages, either through expert testimony or by any other means. Rockwell is a sophisticated party that was admittedly on notice to the failure to put on any evidence of damages arising from this breach powerfully demonstrates that there simply were no damages to prove. The District Court committed legal error by assuming, without any basis in the record, that Rockwell's damages from this breach were at least equal to the $3.2 million remaining under the damages cap. And contrary to Rockwell's claim, the existence of a damages cap in this case does not alter the analysis in any way. As this Court has repeatedly affirmed, a District Court is required in all cases to explain the facts and methodology used to arrive at a damages award. In other words, under New York law, damages must be proved to a reasonable degree of certainty, damages cap, or no damages cap. Because Rockwell failed to provide any evidence of its damages, the District Court's damages award was invalid. What the District Court found, if I understood it correctly, was that Rockwell would have sought a discount in the price if it had been told the facts about the unburdened labor, the misstated inventory, the overheating, and the dropped call problems. And the price, if I understand it correctly, was $50 million up front, plus $14 million later. So the $3.18 million award reflects a 5 percent discount, maybe, approximately? That seems very modest. Even if there's error here, why wouldn't we find it harmless, given that the nature of the breach is such that a 5 percent discount, as I said, seems very modest? Well, Your Honor, under New York law, it's very clear that a district court cannot rely on those kind of general assumptions of, well, this was a big purchase, this is a small percentage. That's simply not permissible. And I would point you to footnote 4 in this Court's decision in Henry, where then Judge — You're saying they would have had to call experts to say, well, if someone had been told these facts, they would have paid only X. But, as I said, even if we were persuaded that it was error, why wouldn't it be harmless error, given — and I think this is implied in the district court's opinion — that the discount sought would have certainly been 3.18, 3.2, whatever the amount left in the account was. I mean, is there any basis to think that less than a 5 percent discount would have been sought on the damages found, on the breach found, rather? Absolutely, Your Honor. As an initial matter, we don't think it's supported — It would seem to me more likely that the problem would have been whether they would have entered into the contract at all. But for you to suggest that they would have entered into this contract without being told about the overheating and dropped call problems and the misstated inventory and still paid $50 million plus $14 seems very, very difficult to persuade on. We don't think so, Your Honor. The first point on that that I would offer would be that this counterfactual about what kind of discount would have been offered and then accepted, there's no support for that in the case law. What the case law requires — and this is Merrill Lynch v. Allegheny — it's the difference between the value of the company as warranted and as delivered. And as the district court found here on page 51 of the special appendix, Rockwell put forward no evidence of the value of ICG, either as warranted or as delivered. But wouldn't the price at which they agreed to pay for it as warranted be adequate for that? Well, even if you take that to be the as warranted price, they put forward no evidence of its as delivered value. And then — No, no. I understand that. But are you saying that the as delivered price could possibly have been more than the 5 percent discount — Absolutely. — that the district court found? What would be the basis for reaching that conclusion? I know they have the burden. You don't have to tell me that. But given the nature of the breach they showed, you don't think that that would have supported a 5 percent discount in the value of the company? Not at all, Your Honor. Page 2067 of the appendix is an internal Rockwell presentation contemporaneous with the acquisition where they valued the company at $104.5 million. So there's significant evidence that they were getting this company at a significant discount. There's also significant evidence that throughout this process, Rockwell would not allow ICG to disclose their identity because they were concerned that other companies would swoop in and inquire ICG instead. As to the reasonableness of what you described, around 5 percent, what we know from the record is that these issues were resolved within four months of the acquisition, and the radio programs were back and had met their development milestones. So you have four months. The only evidence that comes close to quantifying how long it took to address these defects. Nobody testified that ICG was worth less than what they paid for it. Nobody testified about how many hours were spent on these problems. In fact, the testimony was, we don't have the ability to tell you who worked on this, how long it took them, any of those price. So the only thing they said was it took months. That's all we have. But the evidence is that within four months, they were completely back on track. So even if every single person at least within those four months except addressing these two issues, which clearly just isn't the case, you still don't get to $3.2 million. And at the end, ultimately ---- So you'd say the district court clearly erred in concluding that Rockwell acquired the company believing it was going to cost about $7.9 million to complete these projects, and in fact, it cost substantially more. That was clearly erroneous? The damages figure that they put forward, Your Honor, was for the fraud claim. And then when they lost on the fraud claim, they said every dollar of damages we asserted for fraud, we're also going to assert that to fix these two discrete design issues. On page 15 of their brief, they make clear that those ---- that cost estimate included addressing these issues and other issues. This was part of the district court's calculation in thinking about how to award damages, right? I don't believe so, Your Honor. With regard to this warranty, because we've only appealed the damages calculation as to the warranty against material adverse effects. So on page 64 of the special appendix, the only thing that the district court relied on in coming up with the $3.2 million figure was Ed Acton's testimony that this was ---- these were serious problems, just that's the ---- nothing quantifiable, just these are serious problems, and then the district court's subjective impression about the importance of getting these products to market. So nothing quantifiable went into the district court's calculation of damages on this point, Your Honor. And there have to be ---- it has to be a reliable estimate that is based on actual evidence. It cannot be based on general assumptions. And as this Court vacates district court's damages awards when a district court fails to adequately explain its methodology or when its calculations are not sufficiently precise. And in this case, the district court had no way of really explaining its methodology because no methodology was employed. There's no way for this court to look at what the district court found and rigorously analyze that methodology because it was just based on these subjective impressions. And there's no way for this court to determine whether the calculations were sufficiently precise because there were no calculations whatsoever. Turning to Rockwell's issues on appeal, it raises three principal arguments, none of which have any merit and all of which are directly refuted by the district court's own findings. First, Rockwell argues that the district court failed to consider these omissions in denying its claim for fraud. But on page 64 of the special appendix, the district court specifically found with regard to these very same omissions that Rockwell failed to prove even by a preponderance of the evidence that they were made with, quote, the required fraudulent intent. In support of this finding, the district court also found on page 45 of the special appendix that after 15 days of trial, the defense witnesses were simply more credible than the witnesses for Rockwell. It also concluded based on, quote, substantial documentary evidence that ICG's employees did not intend to misrepresent anything about the company and that the alleged misrepresentations were in any event consistent with accurate statements. I see that I've ---- Thank you very much. You've reserved three minutes for rebuttal. Yes. Thank you, Your Honor. Mr. Hall. May it please the Court, Thomas Hall, on behalf of Rockwell Collins, let me first address the damage point on the appeal. Judge Rakoff, I think, correctly found that the measure of damages was a benefit of the bargain. Had these material adverse effects been disclosed to us, the value of the company, we would have paid less for the company. He found those defects to be critical. He said they took great time and expense to correct. It took months to correct each of them, and they required a dramatic redesign. I think this Court's decision in the Tractabelle case is very instructive. The three points I ---- we emphasize from that case are, one, that New York law allows significant flexibility in estimating general damages. Number two, some level of improvisation is permitted. And three, certain variables may be assumed unless undermined by the evidence. Judge Rakoff found no difficulty that we would have demanded and received at least a 5 percent discount. He cited exactly the risk factors that Rockwell Collins considered in agreeing to pay $64 million. Of course, when we considered them at that time, we did not know about these two design defects. And those risk factors were, one, how much is this going to cost us to complete? Had we known of these defects, we would have concluded it would have cost significantly more. In fact, it cost almost $24 million more than expected to complete these programs. Kagan Is that number substantiated in the records? It is, Your Honor. Your Honor, yes. There's a different ---- sometimes it's 17 million, sometimes it's 24 million. But that is in the record. I think it's in Judge Rakoff's opinion, too, where he talks about our position as to how much more it costs. But it is substantiated. Number two, delay.  ICG was spending ---- they disclosed to us they were spending $340 million. It should have been $500,000 a month. Judge Rakoff found that was understated. It should have been $500,000 a month. So every month of delay is adding hundreds of thousands of dollars to the cost. Number three, liquidated damages. We were on a strict timeline with Honeywell. And to the extent we missed milestones, we were exposed to liquidated damages. In the end, we received a liquidated damages claim from Honeywell for $14 million. Number four, lost or delayed sales. And number five, most importantly, this was a strategic acquisition. Rockwell's prime motivation for acquiring this company and these products was not for the products themselves, but they were going to use these products to leapfrog to a new generation of radio. It estimated, this is in the record in his opinion, that we would be able to save 24 to 36 months off development time for the new generation of satellites and radios. That we were deprived of that entirely. So we submit that there was more than an adequate basis for Judge Rakoff's 5% discount. Turning to our appeal, our cross appeal, I think the primary point I want to emphasize, Your Honors, is because this drives a lot of our issues, is that there were two buckets of misrepresentations. One, the misrepresentations as to milestones, where they are in completing certain tests. Judge Rakoff analyzed those thoroughly, concluded there was no fraudulent intent, and awarded us nothing on those. But the second bucket really was distinct, and that is these two design defects, which one, were not disclosed, and two, they represented just the opposite, that there was a minor thermal problem. In concluding there was no intent as to the first bucket, Judge Rakoff pointed to two significant facts. One was, he talked about a confusion of the terminology that was being used, that we were effectively talking past each other. When the other side used red label, we believed it was something, they meant something else. That confusion of terminology had nothing to do with the design defects. There was no confusion of terminology there. The second thing he pointed to was there were snippets in various documents, that had we pulled them together and studied them carefully, would have revealed to us that these milestones were not met. But that analysis has nothing to do with our claim for these design defects. So the very reasons in his decision why he found no intent as to the milestones, have no application whatsoever to the design defects. He does say, as my adversary points out, on both page 62 and page 67, where he's addressing all these misrepresentations, he does say for the reasons discussed above, I find no intent. But the only reasons discussed above went to the milestone misrepresentations, not to the design defect misrepresentations. And what do we know about those design defects? He made a number of factual findings. Number one, ICG knew about these going back to 2014, at least seven months before the acquisition. Number two, they were repeatedly discussed internally at monthly meetings within ICG. Number three, they received two letters from their customer Honeywell, one in December 2014, one in June 2015, complaining about these defects. Number four, ICG was a market leader in this field. They had developed the prior generation of radio, ICS 220, and if they couldn't solve these problems, who knows if we could. Lastly, as I mentioned, they represented at a July meeting that these were minor thermal issues easily fixed. The distinction, recognizing there are two buckets of misrepresentations, and not the other, drives most of our arguments. It drives the fraud claim in denying us recovery on the fraud claim. We don't think he adequately analyzed the design defects. It affects the argument about piercing- I thought you were arguing primarily that he didn't adequately address the possibility that there were gross negligence in- That's our secondary argument, yes. But the initial argument is that when addressing the cap, for example, and considering whether or not there was fraud, he did not analyze whether there was intent with regard to these design defects. With respect to the gross negligence argument, my reading of New York law is that to overcome a commercially negotiated damages cap, New York law looks to something akin to fraud and intentional misrepresentations no matter what, that gross negligence is supposed to be akin, that would justify overlooking the cap, is akin to a fraud finding. So it seemed to me that Judge Rakoff's determination on rejecting the assertion that there was fraudulent intent kind of established that the cap would apply. Do you agree with that interpretation of New York law? I don't agree with that, Your Honor. I think fraudulent intent is something different than gross negligence. We cite a number of cases addressing specifically caps, a number of New York cases that used, when it's talking about what does gross negligence mean when addressing a cap, it talks about reckless disregard for the truth. Justice Kagan wrote that it smacks of intentional wrongdoing. That's the New York public policy. I think you have to look at the factual scenarios. I think in the Metropolitan Life case, which I think may be the one you're referring to, Your Honor. It's a summer versus Federal State. Okay. In the summers. In some of these cases, when you're talking about a party exercising contractual rights, that has been the standard, yes, that it's a very, very high level. When a party exercises contractual rights, even if in breach, there has to be some really high level of intentional misconduct intended. I think the second level is the Solow case, where a party fails to comply with its contractual obligations. And in Solow, the First Department set forth a slightly lower standard, bad faith. I think the third category are breaches of representations and warranties that we provided as supplemental authority. The Deutsche Bank case out of the First Department, and there the Court found knowing, allegations of knowing, and persistent misrepresentations of breaches and warranties was adequate, at least at the pleading stage, to satisfy the gross negligence standard. So I think the standard depends on the factual setting, and I don't think that a finding of lack of fraudulent intent constitutes a finding of no gross negligence. And am I right in understanding that the contract itself provided only, made only general representations and warranties as to the status of these two products, and that it's really the presentation, the PowerPoint, and oral conversations that you're relying on to intimate fraud on the part of ICG, is that right? That was the — yes, I think they were both, but it was largely driven by those meetings in July in which they gave us detailed presentations of the status of the programs, and failed to disclose these design defects, but — and rather represented the opposite. It struck me as surprising that if these were important parts of the acquisition, that there were no written representations and warranties that were part of the contractual arrangement between the parties. Just out of curiosity, can you address that? I mean, does the record speak to that in any way? I think there were representations and warranties made about the expected cost to complete, and that was one of our claims. I think there were representations and warranties made about no material adverse effect. So I think — But no material adverse effect is a very generic kind of warrant. Well, but the — It's a boilerplate. It is, but the judge found it to be breached here. But Your Honor is correct. You know, it was — there were primarily detailed representations about the status made to us at those July meetings. Thank you. Thank you. Thank you very much. Mr. Duboff, you have three minutes to rebuttal. Thank you, Your Honor. As my colleague noted, their theory of damages in this case is benefit of the bargain. And as this Court has repeatedly held, and as New York law makes clear, benefit of the bargain damages are the difference between the value of a company as warranted and as delivered. And as the district court specifically found here, page 51 of the special appendix, they failed to put forward any evidence of ICG's overall value. Either as warranted or as delivered. So their claim of benefit of the bargain damages really defeats their case because as the district court found, they didn't put forward any evidence that could be used to calculate damages on that basis. Mr. Hall talked about the Tractabelle case where they talked about flexibility with the damages. I would ask this Court to consider the city of New York versus New York case. That is the case where the city was attempting to get reimbursed from the state for the care of certain mentally disabled individuals, but they didn't actually provide evidence of the money they spent caring for these individuals. Instead, they tried to rely on basically a formula they came up with about average costs and things of this nature, and what the first department found was you can't do that. You took care of these people, you were the one who expended the money, you knew litigation was coming, you should have presented evidence of what you actually spent. The exact same situation applies here. Rockwell admits that shortly after the acquisition, they were on alert that this was probably going to lead to litigation, and yet they didn't keep track of their expenses. They brought forward no specific evidence of what was required to address these defects, and so the burden, obviously it's their burden to prove damages, but in this case in particular, they had the obligation to bring forward that evidence. Because they didn't bring forward that evidence, had they put forward a valuation of ICG, we would have been able to obviously attack that valuation with evidence of our own. Had they brought forward evidence of how much money they allegedly spent to address these design defects, we would have been able to bring forward evidence that said, well, that wasn't an engineeringly reasonable way to fix these issues. They could have been fixed in a much more simple fashion. We didn't have the opportunity to do that because they didn't put forward any evidence. And you raised that to the district court. You said there's an inadequate basis for any damages award here. Is that what you said? We did, Your Honor, both at trial and in a 52C motion where we said there's been no valuation evidence, so there's nothing to base a damages award on. There's been a consistent conflation in this case about the damages from fraud and the damages from this particular warranty, which is the one that we are appealing. And as Mr. Hall said, he said 24 million sometimes, sometimes it's 17 million. To me, $7 million is a pretty big difference. It shows that these damages are not actually anything that was proven in the record. These are internal Rockwell estimates that both accounted for their much higher labor rate than ours. They accounted for, as the district court found in footnote 6, a four- to five-month expansion of the scope of the project that we had no say in. That was all factored into this analysis. It factors in the fact that very shortly after the acquisition, they, by their own admission, fired anybody who knew anything. What standard of precision do you think the district court should have been held to? I mean, you've talked about the valuation of the company. Sure. You've talked about the amount of time that passed. And we've talked about the different labor rates and the actual amount of completion and so on. Wasn't the district court entitled to take the evidence before him, especially given the his finding that the cap applied, and make a reasonable estimate of the damages suffered in light of the wrongdoing that he found? I don't think so, Your Honor. It cannot be based on general assumptions. The district court had said, look, they would have asked for at least $1,000 off the price. You're saying that that would be reversible error? I think that would be reversible error. It probably would not. The district court's opinion says that there's $3.1 million left. Given Acton's testimony regarding the seriousness of the unreported problems, as he understood them at the time of the acquisition, as well as the lack of a horizon, supported by documentary and testimonial evidence regarding the importance of the swift completion of the program, the court had no difficulty in saying that they would have demanded a discount of at least $3.184. Is our quarrel here about the dollar amount? That's what I meant when I said to you, what if he had said, well, they would have sought a discount of at least $1,000? It seems to me that that's what we're really talking about. It's not that the district court couldn't take the seriousness and the time and all of these factors into account and said, look, I'm not going to put on a green eyeshade and decide this to the penny, because it's definitely over $3.18 million. And I'm hard-pressed not to agree with that. Your Honor, there's no evidence that the damages they suffered came anywhere close to that amount. And there's also — But it had to take four months to reestablish this whole system. I mean, we are — we do have a record that shows the time was of the essence. They had deadlines with respect to another party. I don't know how you can say that that didn't result in them overpaying for the company. Your Honor, there's a very clear way established in the law to prove that you overpaid for a company, and it's to bring forward a valuation of that company. That's by putting forth expert testimony. The district court is saying, I don't need expert testimony in this case. And that is one of the principles of the Federal rules. The fact finder only gets expert testimony if it needs it. It didn't need it. Your Honor, I think you would be hard-pressed to find a case based on company valuation that didn't include expert testimony. Let me ask you another thing about company valuation. You keep talking about the value of the company as warranted. Given a breach of contract, don't we start with what they agreed to pay it, having been told certain things, and then what they would have paid for it if they had been — if there had not been a breach? Your Honor, no. The case law — But you seem to think you get the benefit of the bargain. That if they — if they persuaded you to sell for less than your company was worth, that that — that absolves you of any responsibility for breach. Absolutely not, Your Honor. They get the benefit of the bargain. But the way you — All right. So that's why you start with their purchase price. I don't — under New York law, that is not accurate, I don't believe, Your Honor. You don't start — you don't — it's not a valid assumption to assume that the purchase price was the value as warranted. But even if that was the case, even if that was the case, you still have to bring forward valuation of the company as delivered. And they didn't do that in this case. Thank you very much. Thank you, Your Honor. I think we have the arguments. We'll take the matter under advisement.